We have one final case for our docket today. Admiral Insurance Company v. Dual Trucking. Good morning to the court. This is Lindy Ola on behalf of Dual. I have my volume up as high as it is. Can you hear me? We can, and I need you to hold on just a minute as we shuffle around in the courtroom. Okay, thank you. Thank you. All right, Ms. Dual, I think we're ready to go, so you can go ahead and start. Thank you. May it please the court, Lindy Ola on behalf of Dual, the petitioners here. This appeal is based upon the district court's order on summary judgment, which we assert violated two fundamental principles of the law. The first being that in determining the definition of a term in an insurance contract, the court's required to follow the plain language of that contract. And here, the court created its own definition beyond what was contained in the insurance contract with regard to the term claim. Could you do me a favor? Sure. Could you just tell me which contract you're talking about? Yes. There are several contracts here, so just instead of saying the insurance contract, just tell me which one you think the problem is. Certainly. Well, there were environmental impairment policies, two of those, and there is a definition of claim set forth in that document. And then there were four contractor pollution liability contracts. Those are CPL policies. And that contract also contained the definition of claim. So the use of claim goes between the CPL policies and the EIL policies. And the court determined that definition of claim in the contracts, and I'm using CPL and EIL when I'm saying contracts, was that it required notice when they were aware of a party intending to hold them responsible. By them I mean dual, for damages arising out of a pollution condition. And similarly with respect to the applications that were completed for the CPL policies and also for the EIL policies, it required dual to disclose circumstances that could result in a claim brought against them. But the claim in this instance relates to a claim for a pollution condition. And what the court did was determine that this definition of claim included any type of matter that they were involved in that dual was involved with. And where we see that happening is the court's almost holistic reliance on the letters from the Department of Environmental Quality. And as you go through each of those letters, there is never a contention that dual was involved in a pollution condition. Instead, all of those letters, except the last one, which is beyond the time period of when they were completing these applications, and in fact was the one claim that they did report, all the letters. I'm just trying to get oriented here. Sure. As I understand it, the district court decided on the, do you call them CPL policies, that there were misstatements and material misrepresentations. I don't think he ruled that way on the environmental policies, the environmental impairment policies. I think in those, in that case, he said a claim wasn't made within the reporting period. So can you tell me what claim was made within the report, what is the reporting period, and whether there is a timely claim under any of the environmental impairment policies? Yes, thank you. So with respect to the EIL policies, the first notice that dual received of a potential claim for a pollution condition was through a June 26, 2014 letter from the Department of Environmental Quality. Dual reported that claim to Admiral within days. I think it was July 1st. By July 1st, their policy had expired, but the policy contained an automatic extension period for 30 days. So if the event had occurred prior to the policy expiring, then the coverage would continue. The court ruled with respect to the EIL policy, that Dual actually had notice of the claim during the policy period. And because they had, according to the court, they had notice of that claim during the policy period, they had a responsibility to report it before the policy expired. I see. So you're saying you did not have notice of it until June 26, 2014? Correct. And the thing you had notice of in 2014, was that of the July 2013 water release? Or was it something else? No, thank you for clarifying that. That is where the court made the mistake. The court concluded, and this was very disputed in the record, that the stormwater release, which happened in July 2013, was automatically a polluting event. And there's reports in the record, there's testimony through affidavits, that a stormwater release, in and of itself, is not a polluting event. In fact, most of the time they are not. What was this June 26, 2014 letter about? Yes, it was, let me just make sure, because I want to be thorough. The letter is about samples that the Department of Environmental Quality collected in April of 2014. So far beyond the time of the stormwater release. And the department said they did these water releases. They believed, but they did not know, that the stormwater may have gone into an area, into a wetland, causing a problem. Okay. So they... Is the June 26 letter about a July 2013 event or not? I think that's disputed, and that's why, that's why we're having a problem. Because the stormwater release, in and of itself, is not a polluting event. And what they say in 2014 is, that may have caused a problem. We believe are their words. And we want you to go do further testing. So, from our perspective... You're seeking coverage under the EIL policies, because of that letter? You want, something's happened and you want coverage? Yes, so from this letter, because they alleged in here that this could be a pollutant. So, because they got this letter, Dual reported this to Admiral. Okay. So you think that because you got this letter in 2014, you were timely in reporting it during the 30-day period? Yes. Have I got the essence of your claim? Yes. Okay. I just wanted to make sure I knew what you were arguing about, the environmental impairment policy. I appreciate that. That's my questions on that. That's my questions on that. Thank you. Okay. Thank you. And so, that was reported in July, and we believe it was reported as soon as they became aware of a potential claim for pollutants, not anything else. And that's where, with respect to the District Court's definition of claim, we're saying it's not whether or not there's any claim at all, it's whether or not you have knowledge of a potential claim for a polluting event. And the first knowledge of that came from the June 26, 2014 letter. And then subsequent to that, the Department of Environmental Quality filed an action in state court in 2015, and a third party, the Harmons, filed an action as well, where this allegation about pollutants of the wetlands is contained. That case has not been decided, and that's where we're seeking coverage for defending that. I can tell you it's in the record that in 2016, a report was done saying that the storm water was not a polluting event. But the merits of that has not been decided yet. That is still pending in district court. And then moving on to the CPL policies, that's where the court ruled that Dual had an intent to misrepresent Admiral when they completed the applications for all of those policies, the CPL policies. And our position there is that whether or not Dual had the intent to deceive is not something the court can decide at summary judgment level. That is subject, that's a factual determination, that the trier of fact needs to evaluate based on the evidence presented. And notably, the case the district court relied upon, it was a Louisiana case, is a case that talked about the standards to be applied when you're in trial, not at summary judgment, but when you're in trial, based upon the evidence deduced, then you may be able to determine whether or not there was an intent to deceive. But our position on that is that the court did not have the authority to make that decision at summary judgment level. Similarly, in regard to the CPL policies, there was the question about whether or not Dual was aware of circumstances that could become a claim in the future. And there again, whether or not something can or cannot become a claim in the future cannot be decided at summary judgment level. There's a host of disputed facts about the communications Dual was having with DEQ, which is, again, principally what the district court relied upon, are these letters. But if you go through the letters, you'll see those letters are talking about licensing requirements, permit requirements for solid waste management. But they also say that you have to clean up and remove the solid waste or you will be subjected to further action, right? It's not get a license and it's all over, that there is solid waste on the property and it has to be taken care of. First is license, and then there's that in the letters. Correct. And I think there is an assumption that the solid waste is a pollutant. And again, when we go through the 2016 report of the expert, there's not any finding of pollutants on land. So, yes, the department is saying you have to have a license, you have to dispose of solid waste in a particular way, but there is no contention in these letters from DEQ that they're going to pursue damages against Dual for a polluting event. So, again, until June 26. And so at the time they were filling, and again, I should point out that in the first three letters, the DEQ is still discussing whether or not Dual even needs a license for what they're doing. And the department is giving Dual the authority to continue to do their work while they're working out what those requirements might be. So, there isn't any reason for Dual to think that they're suddenly going to have a claim against them for a polluting event. They are working with DEQ to come up with a license, trying to meet the standards that they want to get the permit and licensing that they need, but this isn't about the department saying you're polluting. And, again, that does not happen until June of 2014. Lastly, we had a brief issue in our appeal about justiciability. Our argument in that situation is that the court indicated that he was going to Dual argued Montana law, and the decision was based upon Montana law. And if we're going to apply Louisiana law, we're seeking the opportunity to argue that law to the court. We did not have that opportunity. So that's the foundation of our argument on that, as well as the fact that some of these issues that the court has decided with regard to what was known or not known during the time that Dual was talking with the department are issues of fact that will be decided through the litigation that's pending in state court, and we won't know that until that litigation has been resolved. Let me ask you a question about, suppose there is coverage under the CPL policies. If you are a renter of the property, there's an exclusion, correct? And isn't that an undecided issue if there is coverage? I'm using coverage exclusive of exclusions. You know what I mean. If there's coverage under the main provisions of the policy, don't we have to find out whether you're actually a renter, and therefore there's an exclusion? Yes, that was an issue raised by Admiral that the district court did not address, and there's only one renter in this case, and the one renter is not the only party that had coverage. Say that again? The renter is not, what was the rest of that sentence? DTI is the party that entered into a lease agreement, but DTT also had coverage under the CPL policies, and so I don't know why the court didn't address the question of a renter issue, so we don't know exactly how he was going to consider that issue, but not every entity was considered a lease as part of the lease. Okay. Thank you. Thank you. I'll reserve my 30 seconds there. Can you hear me okay? No. Pull those mics right close to you. Moving closer? There we go. There we go. May it please the court, Emma Mediak on behalf of Admiral Insurance Company. As Your Honor has already noted, the 2012 and 2013 EIL policies are claims-made policies, and there was no claim made during either of those policy periods. I want to ask a question about that. Something happens and you get a claim. How long, I mean, is the reporting period must be longer than the period in which the claim is made to you. Because if it's made on the last day of the contract, you must have a certain amount of time. I didn't find the provision that told me how long, except when you're canceling the policy. So how long do you have to tell them? So typically it would be that 30-day extended reporting period. And what happened here is they got the contract, even if you're not closing out a contract, it's still the 30 days to report? Correct, Your Honor. Okay. What happened here was they got that June 26th violation letter. That was the sixth violation letter they received. And several days later, on the 1st of July, they canceled that policy. They got a refund of their premium for that cancellation. And then the following day, they provided the first notice of that claim. Okay. And so that June 26th letter, that referred to the stormwater release? Yes, Your Honor. So a little bit of background on that. The stormwater releases had happened in July of the prior year. And when DUAL was in the process of getting that license, it provided notice to Montana DEQ that it had had three stormwater releases in July 2013. When did it tell Montana that? In December 2013 as part of a site assessment, as part of that licensing. And so when Montana DEQ found the elevated level of hydrocarbons in that water, they sent the sixth violation letter saying, you told us in July 2013 you had this release. We see hydrocarbons here. We assume that the two are connected. As Ms. Deola noted, Terracon, the environmental assessment company, has now disputed that, no longer thinks that they are connected, thinks that it was agriculture rather than anything coming off this site. But that's an issue that's going to be decided in the underlying case. In terms of what we can resolve here, the DUAL entities undisputedly had knowledge that three stormwater releases had happened in July 2013. And they told Montana DEQ in December 2013 that they knew about those and that those might cause some sort of pollution event because that's what Montana DEQ was asking. But the record doesn't establish, or maybe it does and I just missed it, when DUAL learned about the releases. We know by December, but between July and December, do we know when? We don't know when between July and September. And am I right that the December is outside the policy period anyways? So the first policy was from October 2012 to October 2013. So December 2013 would be outside that policy period. No claims were made during that first policy period, and so there would be no coverage in that first policy period. They do have to be aware that there's a claim before they can make it. Not under Louisiana law, Your Honor. Under Louisiana law, if no claim is made during the policy period to anybody, to the entities who are insured or to the insurance company, there's simply no coverage. So when does Montana first tell them they have a problem with these stormwater releases? Regarding the stormwater releases, that would be the sixth violation letter, which is dated June 26, 2014. Okay. So that's the first time they're told about the stormwater releases. That's the first time they're told that there's elevated hydrocarbons as a result, as a possible result, of those stormwater releases. They were aware of the stormwater releases because they're the ones who told Montana DEQ about that six months prior. Okay. Well, how do they know there's a claim for those? So the policy applications don't ask only, is there a claim that you're making? They ask, are you aware of any potential circumstances which could give rise to a claim? Okay, here's the deal. They have policies for different years. Before the 2012 to 2013 period, there was no actual claim about stormwater releases because they happened in July of 2013. So there's these other letters from Montana. Okay. So this particular event, the stormwater releases, don't result in a claim to them until after the policy ended, right? Until what? June 26, 2014. Until that first EIL policy ended. Yes, Your Honor. Okay. So that policy's over, and they don't know about it. And your position is because no claim was made during that first policy, there is no coverage. You get to this, but they have a second policy that follows on, and the claim is made within the reporting period of the second policy. So two things there, Your Honor. The first is the initial policy period for that second policy, the 2013 EIL policy. That policy period was going to be October 2013 to October 2014, and if that policy had not been canceled and they made notice in July of 2014 and they had no knowledge prior to July 2014, then that would be timely. They had knowledge before July 2014, however, back up. They canceled that policy. Because they canceled that policy, we go into the automatic extended reporting period, and part of the automatic extending reporting period says you can only provide notice of something you didn't have prior knowledge of. So the prior knowledge resets at the beginning of that 30-day automatic extending reporting period, and they chose to reset that because they canceled the policy and got the refund on the premium. I want to make sure I'm clear. So you're saying that if they hadn't canceled that second policy, then they would have had a timely claim? Our position would be it wasn't timely because they would have known about it in July 2013 because how else would they be able to tell Montana DEQ that it happened in July 2013? But except we don't know when they – maybe they knew in July 2013 when the releases happened. Maybe they knew in November, which would have been after the policy period ended and before they talked to DEQ in December. We don't know. That would certainly be a closer question, Your Honor. But here they did cancel the policy, which, again, reset that knowledge period, and they certainly had knowledge of the stormwater releases by December 2013, which was six months before they canceled, and that reset the knowledge period on the 30-day automatic extended reporting period. So they definitely had knowledge prior to the inception of the 30-day automatic extended reporting period. All right. That's the EIL policies. I know you made the claim that the EIL policies were void because of material misrepresentations, but the district court didn't get to that. District court ruled on this reporting business. But the court did rule on the CLP policies that there were material misrepresentations. Now, we know that there was one letter before the 2012-13 policies and other letters before the 2013-14 policy. So are we on the same page on that? Yes, Your Honor. So the cancellation of pollution during the 2012-13 period, canceling that policy because of void for misrepresentation is depending upon that first letter? Yes, Your Honor. Okay. So the first letter, as you noted, doesn't just say you guys might need a license. It says quite a bit more than that. It says there was an allegation of oil field waste being placed at the site in violation of state law. It ordered them to immediately discontinue operating the facility until it was licensed. It ordered them to hire an environmental consultant to clean up the site. And I will note there's environmental contamination at this site. It's TerraCon, the environmental company that's going to do the cleanup if we ever figure out who owns the property and it can be cleaned up because that's not resolved at this point. It's going to be an expensive cleanup. This oil field waste is on the site and it needs to get cleaned up. So it was there at the time. It's there now. That's undisputed. The DEQ was telling them about this just before they asked Admiral to write these environmental policies for them. That letter advised that Montana DEQ was prepared to initiate a formal enforcement action that may include the assessment of penalties. And that's, in fact, what the Montana DEQ action that they're asking us to provide coverage for is all about. It's based on this warning letter and all of the letters that follow that they needed a license and that they didn't have it this entire time. And we know how the dual entities responded when they got this letter. They immediately provided it to council and council immediately contacted Montana DEQ before these policies incepted. That's how they responded once they got that warning letter. So they understood that this was a potential issue that they were going to need to deal with. The dual entities suggest that this court should focus its analysis only on whether a claim had been made prior to the inception of the policies. But the applications ask broader questions. The CPL policies asked whether the insured was aware of any circumstances that could reasonably be expected to give rise to a claim. And certainly when you get a warning letter from Montana DEQ and you hand it to your attorney and your attorney immediately contacts Montana DEQ, you have knowledge that there is a potential claim that could result from what's in that letter. And then the EIL applications, which they filled out concurrently, asked even broader questions. And they didn't answer those questions properly, which goes to the intent to deceive on all six policies. It asked whether the facility was currently in compliance with all applicable environmental regulations. They have a warning letter saying you're violating Montana law because you don't have a license. And here's this application asking, is the facility currently in compliance with all applicable environmental regulations? They didn't answer that correctly. It asked whether the facility had ever been cited for a permit violation. They didn't give Admiral the information Admiral was seeking on that either. And then it asked for a copy of any correspondence related to any public complaints regarding any discharge of pollutants at the covered location. And the warning letter says there is special waste at the site that you need to clean up. And they didn't provide Admiral with a copy of that letter. And it becomes even more clear that they're intending to deceive Admiral when we get to the renewal applications, because at that point they have four violation letters in their file that they've corresponded with Montana DEQ about. One of those says that there's been a liquid invert spill of over 1,500 barrels from the Poseidon tank. And they don't provide that to Admiral. They've got a breach of contract letter from the Harmans who were leasing the property to them. It says you guys have contaminated our property with environmental pollution. They don't provide that to Admiral. So when you look at these six insurance policy applications, it's clear that they had information that Admiral was seeking and they did not provide that information to Admiral. And this substantial number of nondisclosures on the six separate applications for insurance demonstrate that they were acting deliberately to conceal this information from Admiral. And under Louisiana law, that is something that this court can consider without needing to go to a jury trial. The district court here cited Johnson v. Occidental Life. In that case, the district court didn't even reach the question, but the Louisiana Supreme Court on its own decided that there would be no coverage because of the material misstatements in the applications. Additionally, we have a separate policy provision regarding knowledge. So even if this court doesn't find there was an intent to deceive, as long as they had the prior knowledge, there's still no coverage. So we don't even need to reach that intent to deceive question. The undisputed... I want to just ask about... Can I just go back to the EIL policy again? Explain to me the contract provision. Where is the contract provision that says they have to notify you within 30 days of getting the letter? So the way the policy is written is it says that there is coverage for a claim that is first received and reported during the policy period, provided that there is no coverage prior to the policy period. So the grant of coverage is limited to claims that are first, that they first become aware of and report to Admiral during the policy period. So there is no claim during the first policy period? Correct. Okay. No claim was made. Correct. Therefore, there's nothing for them to report. Correct. So they can only... So when can they make a claim? The claim comes in the second policy period. Then they got a claim. It refers back to something that happened in 2013, but they got a claim during the second policy period. So I had originally thought they were making a claim under the second policy period, but they say no, it's under the first policy period. That's what I don't get. How could it be under the first policy period? There was no claim to be reported during the first policy period about these three stormwater things, right? I absolutely agree, Your Honor. They made their notice of claim, and if you look at the notice of claim, which is in the record, it's made during the second policy period, but they say they're making it under the first policy, which you simply can't do because these are claims made in reported policies. Okay. So we all know they should have said, oh, we made a mistake, it's under the second policy period, and they had 30 days to report it. So why isn't it covered under the second policy period? Two reasons, Your Honor. First, we believe that they would have had knowledge in July 2013. But they don't have knowledge of a claim in July 2013. They only have... There's no claim made against them. The policy provides coverage only if there's no knowledge of any circumstances that could give rise to a claim. And if they know that dirty, invert... So then you're back to the policy's coverage is void for misrepresentation. On part of that. So that's for the full 2013 policy period. But we do know for sure that they absolutely had knowledge in December 2013 of those three stormwater releases. And the way that the automatic extended reporting period is written says that, okay, you have coverage during the policy period, but now the policy period is over on July 1, and you didn't provide any notice at any time during the policy period. But we will provide a 30-day grace period, automatic extended reporting period. What are we going to provide coverage for in those 30 days after you canceled the policy and got some premium back? We will provide coverage for claims that are made and reported during that period, but only if you did not have knowledge of any circumstances that could potentially give rise to that claim before the 30-day period incepted. So you're saying you don't have to get to voiding the policies, there's just no coverage under the policy. Because of the prior knowledge. I see. All right. Thank you, Your Honor. Thank you. All right. Ms. Diola, I think you used up all your time since we took your adversary over. We'll give you two minutes. Okay, thank you. I think what counsel highlighted, perhaps better than I did, was that they are saying that as a matter of law, the court can determine what is reasonable. She said they asked broad questions, and you can reasonably assume that this is going to happen. I don't know how a court does that at summary judgment. Whether or not you can reasonably assume something has to be taken in light of the total circumstances of the situation. And the Admiral has decided that knowledge of a storm water release is automatically knowledge of a claim for pollution. They just aren't the same thing. And as soon as, under the EIL policy, as soon as they had noticed that someone was claiming that the storm water release had a potential for a pollution effect, they gave Admiral that notice. I don't know how much faster they could have done that. And, again, when you look at, we talked a little bit about the very first letter that came from the department when we were talking about the CPL policies. It says if the allegations are correct, you are operating an unlicensed solid waste management facility. They don't say if these allegations, which we don't even know who they're from in that letter, it just says we got a report, it doesn't say you are violating the pollution standards, which when we get into 2014, we can see that there are specific statutes relating to pollution. Those aren't alleged in those letters. So what they knew was that there may be a problem with what they were doing because they didn't have the proper permit. They did not know that there was an allegation of pollution. And so what they knew or did not know or should reasonably know is not a question that can be decided at summary judgment. Thank you. All right. Thank you, counsel, for your helpful arguments. The matter of Admiral Insurance versus dual trucking is submitted. And that concludes our docket for the day. Thank you. All rise.
judges: HAWKINS, FORREST, Restani